UNITED STATES DISTRICT COURT
FOR THE
DISTIRCT OF MAINE

| | |
|---|---|
| PAMELA BOUCHER | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LEWISTON SCHOOL COMMITTEE | ) |
| and K. JAKE LANGLAIS, Superintendent | ) |
| for the Lewiston Public Schools | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT**

NOW COMES Plaintiff, Pamela Boucher, and hereby complains against the School Committee of the City of Lewiston and K. Jake Langlais as follows:

1.  Plaintiff, Pamela Boucher, ("Boucher") is an individual residing in Auburn, Androscoggin County, Maine.

2.  The School Committee of the City of Lewiston ("Lewiston Schools") is the organization established by Article V of the City of Lewiston Charter and 20-A M.R.S.A. § 2301 to perform all duties necessary for care and management of the city's public schools.

3.  K. Jake Langlais is the Superintendent of Lewiston Schools with the powers and duties set out in 20-A M.R.S.A. § 1055.  Langlais has been the Superintendent of the Lewiston Schools since July 2020 as Interim Superintendent, and as Superintendent since September 2020.

4.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

5.  The School Committee of the Lewiston Schools is responsible for the oversight of the structure and management of the Lewiston Schools, including implementing policies and the

leadership, organizational structure, as well as educational and personnel practices implemented by the Superintendent.

6. Boucher began working at Lewiston Schools in 2012 as a Home School Social Worker, housed at the high school.  She became the District Clinical Supervisor in 2014.  Boucher was appointed as the Director of Special Education in July 2016.

7. In November 2019, Lewiston Schools offered, and Ms. Boucher accepted, a Management Contract for the term beginning July 1, 2019, and ending on June 30, 2022, at an annual salary of $105,771 ("2019 Contract").  The 2019 Contract is attached hereto as <u>Exhibit 1</u>.

8. The 2019 Contract contained the following terms indicating that the contract could be terminated "by mutual consent at any time and may be terminated by the School Committee for cause as provided by statute."  No other provisions in the 2019 Contract gave Lewiston Schools the authority to terminate the contract.

9. In June 2020, Lewiston Schools offered, and Ms. Boucher accepted, a Management Contract for the term beginning July 1, 2020, and ending June 30, 2023, at a salary of $111,124 ("2020 Contract").  The 2020 Contract is attached hereto as <u>Exhibit 2</u>.

10. The 2020 Contract contained the following terms indicating that the contract could be terminated "by mutual consent at any time and may be terminated by the School Committee for cause as provided by statute."  No other provisions in the 2020 Contract gave Lewiston Schools the authority to terminate the 2020 Contract.

11. As the Director of Special Education, Boucher was the administrator responsible for directing and implementing special education services to students at every school in the Lewiston Schools.

12. Special education services to students must comply with specific legal and regulatory requirements. Boucher and her special education staff had the education, training and certifications needed to ensure that services were implemented in accordance with the law.

13. The Lewiston Schools has a long-standing history of violating the requirements of special education law and violating the civil rights of its students. Specifically, on February 7, 2017, the American Civil Liberties Union of Maine, Disability Rights Maine, Kids Legal of Pine Tree Legal Assistance and Maine Law/Cumberland Legal Aid Clinic ("Advocates") notified Lewiston Schools of the results of a two-year investigation which found that Lewiston Schools violated students' civil rights. Some of the data the Advocates relied on showed discriminatory practices from the 2013-2014 school year.

14. The Lewiston Schools operate seven separate school buildings: Lewiston High School, Lewiston Middle School, as well as Connors, McMahon, Farwell, Montello and Gieger elementary schools ("Building"). Each Building is assigned a Principal/administrator, who has full responsibility for all aspects of the Building, including but not limited to staffing, students and operations.

15. The Lewiston Schools special education department is staffed by, among others, special education supervisors, teachers, service providers and educational technicians who work in the various Buildings at the Lewiston Public Schools.

16. The Lewiston Schools special education department assigns Building supervisors to oversee special education services and staff at each Building.

17. Lewiston Schools have implemented a leadership organizational structure that gives non-special education Building principals/administrators complete autonomy and authority

over programs in the Buildings which they operate, including the authority over special education Building supervisors.

18. The organizational structure implemented by Lewiston Schools interferes with and prevents legal, effective and consistent special education services to the students of Lewiston Schools.

19. The Superintendents of the Lewiston Schools, including Langlais, and the School Committee in its oversight of the Superintendents and the schools, have created a culture where there is a divide between special education staff and general education staff to the detriment of services provided to special education students. The Lewiston Schools have overruled special education administration recommendations in favor of the demands of Building principals/supervisors, even when the demands of Building principals/supervisors violated special education law. The Lewiston Schools have moved special education staff to cover general education assignments. All to the detriment of special education services provided to students.

20. The Lewiston Schools have further made special education services ineffective by crediting virtually every complaint made by general education leadership and staff, even when those complaints of general education arise out of misunderstanding or misapplication of special education law, and immediately blaming the special education department for the complaint raised. The Lewiston Schools, through the practices of its Superintendents and the oversight of the School Committee, have created a bias against special education.

21. Boucher is knowledgeable about special education law and consistently performed her work in accordance with the law and what is best for students.

22. In July 2017, Boucher received her first and only performance review. The review was performed by Superintendent William Webster. The review was highly complimentary of Boucher's skills and rated her performance effective. Webster noted that Boucher had one of the most difficult jobs in the district; he further noted her hard work, compliance with best practices; fiscal responsibility; substantive participation in leadership; effective program development and positive good humor.

23. Suddenly, in August 2017, Superintendent William Webster ("Webster') issued an addendum to Boucher's performance evaluation ("2017 Performance Addendum"). The Performance Addendum did not comply with ordinary performance evaluation procedures. Webster's purported reason for issuing the Performance Addendum was anecdotal information Webster received by conducting four exit interviews of general education and special education staff. Such anecdotal information is unreliable, unfair, prejudicial and an ineffective measure of performance and should not have formed the basis for the Performance Addendum to Boucher's performance evaluation.

24. In the addendum, Webster identified seven negative criticisms of Boucher's performance and leadership. Webster assured Boucher that the Performance Addendum would not negatively impact her position but asked that she work with a job coach for continued success. Boucher, who strives for professional growth and is open to feedback, willingly agreed to work with a coach.

25. Webster selected a coach and Boucher worked closely with the coach for over five months. After extensive and close work with Boucher, as well as surveys and interactions with staff in the special education and general education departments in the Lewiston Schools, the coach issued a report highly complimentary of Boucher's skills and leadership and noted the

barriers the special education department faces in implementing services at the Lewiston Schools. Among the recommendations was to ensure job performance evaluations were based on specific criteria and observable and/or documented situations – not comments from staff. Another recommendation was that the Superintendent and Assistant Superintendent work with the Director of Special Education and Assistant Director of Special Education to reduce the divide between general education and special education.

26. Boucher implemented the recommendations the coach made to her. Lewiston Schools did not implement the recommendations made to it.

27. In July 2018, the Assistant Director Special Education left her position at the Lewiston Schools. The position remained open until end of December 2018. During this entire time Boucher was drowning in work. She repeatedly asked for assistance, which was denied.

28. In September 2018, Boucher became aware of a student who was being barred from Lewiston High School because of an incident that had occurred at Lewiston Middle School. Boucher complained to Superintendent Webster and Langlais (who was the High School Principal at the time) that the student's rights were being violated and that the student had to return to school. Boucher reported to Webster and Langlais that she had convened an Individualized Education Plan ("IEP") Meeting and a determination was made that the student should be in school. The IEP determination was overturned by a high school Building Administrator and prevented the student from returning to school, in violation of law. Boucher confronted Webster and asked him if he wanted her to do her job and uphold the law. The Superintendent's office was more concerned with supporting Building Principals/administrators than upholding the law.

29. During the same time period, Boucher had a disagreement with a Building Principal/administrator of one of the Lewiston Schools about the implementation of the program designed to provide services to students with autism. The Building Principal/administrator wanted to alter the staffing in that Principal/administrator's building. Boucher met with the Building Principal/administrator to try and resolve the problem. Boucher presented evidence as to why it was important that the services be provided consistently across all schools in the district.

30. After the meeting, the Building Principal/administrator, unbeknownst to Boucher, contacted Assistant Superintendent Shawn Chabot ("Chabot"). Chabot met with the Building Principal/administrator without Boucher. After the meeting, Chabot instructed Boucher to do what the Building Principal/administrator asked. Boucher objected but Chabot disregarded the needs of special education and permitted a Building Principal/administrator to surreptitiously override the decision of the Special Education Director.

31. In November 2018, Boucher voiced to Lewiston Schools administrators and to the School Committee that the budgeting process, which was led by a new Chief Financial Officer for the first time, was not sufficiently transparent and made it difficult to determine what was allotted to special education. Boucher stated that the process should be changed for next year.

32. Boucher did not receive an annual performance evaluation in 2018 that followed observable and objective criteria. Nonetheless, in November 2018, Chabot prepared a memorandum entitled "Concerns" and delivered it to Boucher ("Concerns Memorandum"). The Concerns Memorandum suffered from the same defects and raised the same unsupported and faulty perceptions of the invalid Performance Addendum. The memorandum, consistent with the culture created by the Superintendents and the School Committee, criticized Boucher for

interactions arising out of her efforts to ensure compliance with special education law and pointed to untrue criticism by staff, who were unhappy with necessary special education decisions, leveled at Boucher.

33. Despite Webster's assurances to the contrary when he issued the Performance Addendum, Chabot used the Performance Addendum to create the Concerns Memorandum and threaten Boucher's job. Chabot's Concerns Memorandum followed on the heels of, and were issued in retaliation of, Boucher's objections to violating a student's rights, Boucher's objections to a Building Principal/Administrator altering the services provided to students with autism, her budgeting concerns, as well as her other efforts to implement and enforce special education law.

34. In response to Chabot's Concerns Memorandum, Boucher, on her own accord, reached out to her coach and initiated additional work with him.

35. One of Boucher's responsibilities pursuant to special education law was to ensure students were placed in the least restrictive environment.

36. During the 2019-2020 school year, Lewiston Schools continued to undermine and interfere with the provision of special education services to students at Lewiston Public Schools and Boucher continued to object. A General Education staff member engaged in a heated interaction with a member of special education administration, behavior that would not have been tolerated if directed at a Building Principal/administrator. The General Education staff member wanted the student removed from the staff member's classroom, in violation of special education law requiring the least restrictive environment. When Boucher attempted to initiate personnel action through written documentation, the Administration blocked the write up and told Boucher that her staff needed to have a "tougher skin." Following the Administration's blocking personnel action, the General Education staff filed a complaint with the DOE alleging

that, by failing to remove the student, the Lewiston Schools were not meeting the student's needs.

37. During the 2019-2020 school year, the software platform that was used to provide speech services to students was turned off and discontinued without the knowledge or consultation of Boucher. Boucher found out about the action from the technology company. Boucher immediately objected to Todd Finn ("Finn"), who was the Superintendent at the time. Finn deferred the conversation to the CFO. Boucher repeatedly complained that the Lewiston Schools actions were unacceptable and had to be remedied immediately. Nonetheless, she had to demand repeatedly that the problem be solved. She engaged the services of a technology attorney and eventually was approved for an inferior product. Boucher ensured that student's speech services were met, including missed time from the Lewiston School's actions that occurred without her knowledge or consent. Lewiston Schools falsely communicated to the community that the problems with speech services were due to the special education department failing to do its job.

38. During the 2019-2020 school year, Finn changed the reporting structure such that special education supervisors in each Building would report to Building Principals/administrators. Not only did this action formally institutionalize the divide between special education and general education, it gave the power to general education to overrule special education services and removed the authority of the Special Education Director to enforce special education law. Boucher objected to this action.

39. During the 2018-2019 school year, and continuing in the 2019-2020 school year, Boucher planned professional training for her special education staff on professional development days. Building Principals/administrators did not plan training for professional

9

development days, and instead permitted staff to work in their classrooms on early release days. Because the Building Principals/administrators did not require training, the teacher's union objected to the lack of free time for special education staff and demanded increased pay. As a result, Boucher was forced to abandon her staff training.

40. Boucher continued to press the issue that training should occur on early release days and was finally given approval in March, 2020, however, due to the COVID pandemic, the Lewiston Schools shut down on March 13, 2020.

41. In retaliation for Boucher's complaints about the budgeting process, the CFO's blocking Boucher's attempt to discipline a general ed staff member for her heated attack of one of Boucher's team, and Boucher's objections to the unilateral termination of the speech program, the CFO convinced Finn to engage consultants to conduct a review of the special education department.

42. Boucher objected to spending Lewiston Schools funds on a private consultant because the Maine Department of Education ("DOE") had recently completed an evidence-based and extensive audit of the special education department. The DOE audit was completed within required time frames and the final report indicated no further action. The DOE was highly complimentary of Boucher's department, her work and her staff in providing special education services.

43. Nonetheless, the Lewiston Schools engaged the consultant to review special education. Boucher was denied access to the consultants and excluded from the organization, planning and structure of the audit. Boucher's role was limited to providing documents to the Chief Academic Officer ('CAO") to provide to the consultants and participation in one, forty-minute panel with the consultants that contained multiple staff present. By contrast, the CAO,

who had no extensive involvement in special education, was extensively involved with the consultants. Boucher requested that the consultants be given relevant information and Lewiston Schools did not respond to the request.

44. The consultants issued a report that contained many erroneous facts and inaccurate analysis. For example, the consultants' report contained conclusions based on a review of 9 IEPs out of 1,010 in the Lewiston Schools. The information provided to the consultants was organized and controlled by the Superintendent's office. Criticisms aimed at special education were actually within the purview of general education. The consultants did not have access to the DOE audit, the letters that complimented her department from that audit, or the detailed findings of Boucher's coach. Additionally, when Boucher received the results of the report, she conducted her own surveys of the entire staff and obtained different results than reported by the consultants.

45. The Lewiston Schools used the consultants' report to support a false narrative that the special education department was failing to perform when the true problem at the Lewiston Schools was the School Committee, Superintendents and Building Principals/administrators' interference with special education and refusal to follow the law, despite Boucher's frequent objections.

46. The report was created to, and used to, retaliate against Boucher for her objections to the Lewiston Schools' practices.

47. Lewiston Schools were closed due to the COVID pandemic from March 2020 through May 2020. Boucher was in the office during the closure. She maintained a Google doc for her staff to provide information and updates. Boucher regularly participated in management meetings at which she informed Lewiston Schools leadership that, once instruction re-started,

Lewiston Schools was mandated to provide specially designed instruction ("SDI") as required by special education law.

48.     During a meeting with staff to prepare for opening in May, Boucher informed staff that SDI would be provided upon opening. Staff objected in heated fashion; voices were raised at Boucher for her holding to the standards required by law. Staff believed that when school opened, services would be limited to "building relationships" with students. After the meeting the Building Principal/administrator called Boucher, raised her voice and demanded to know why "conflicting" messages were being given. Boucher corrected the Building Principal/administrator, reminding her that SDI is required by law and that the two were not mutually exclusive. Staff could provide SDI and focus on student social emotional needs caused by the pandemic. The reporting structure, which gave Building Principals/administrators authority over Special Education Supervisors, was continuing to interfere with the provision of required special education services.

49.     During the Summer of 2020, Langlais became Superintendent. Prior to the start of the school year, and during the fall of the 2020-2021 school year, Boucher again complained to Langlais about the organizational structure whereby special education supervisors reported to Building Principals/administrators. She further reported ongoing compliance problems that she was having from particular Building Principals/administrators where students continued to be placed on an abbreviated school day in violation of their civil rights. Boucher reported her difficulty of holding individuals in the particular Building(s) accountable, as she was met with hostility, yelling, disrespectful treatment and retaliation toward her and her team when they tried to implement special education legal requirements.

50. Simultaneous with Building Principals/administrators refusing to engage in disciplinary action for a staff member's refusal to comply with the law and over-reliance on suspension or expulsion, the staff member instead complained that Boucher and her assistants were creating a hostile work environment for the staff member. During her interactions with Human Resources in connection with the complaint, Boucher reported the ongoing hostility being displayed toward her and special education leadership. She requested a thorough investigation about retaliation toward special education. Boucher never heard back from Human Resources.

51. During 2020-2021, Boucher became increasingly concerned with the lack of compliance within Lewiston Schools and the ongoing interference with her efforts to implement special education law. For several years, Boucher had been repeatedly requesting authority to engage attorneys to come to the district to train Building Principals/administrators about the requirements of special education law. Trainings were conducted over the course of the school year for Building Principals/administrators. At the conclusion of the trainings, attendees were expected to complete a test to ensure subsequent trainings were useful. A small minority of tests were completed. Boucher reported the failure to comply with the testing expectation to the Assistant Superintendent. Nothing was done.

52. Boucher was further concerned about the false and misleading information that had been presented to the school board about special education. Boucher presented to the School Committee on February 1, 2021 and provided a counter to the misleading information. The School Committee continued to make false and misleading negative information about special education that was not corrected despite Boucher's requests that the Superintendent, Langlais, and Assistant Superintendent do so. When Langlais and the Assistant Superintendent did not

correct the statements made by the School Committee, Boucher provided data to them to present to the School Committee to correct the false and misleading statements by the School Committee. Langlais refused to do so.

53.     During the 2020-2021 school year, Boucher attended a meeting with auditors and other management staff. The topic of the meeting was Response to Intervention ("RTI") and Multi-Tiered System of Supports ("MTSS") which are general education, not special education services. Boucher felt the meeting was productive and had a positive feeling coming out of the meeting. However, soon after the meeting, Langlais told Boucher that he had received reports that she had been defensive at the meeting. Boucher corrected Langlais as the topic of the meeting was not special education. The false report was another act of retaliation against Boucher.

54.     Boucher continued to complain to Langlais about the problems caused by the reporting relationship of special education supervisors. Boucher complained that the reporting structure prevented the primary role of the supervisors to be to uphold the law. Boucher further complained that the problem flowed from the Superintendent and Assistant Superintendent's office. Boucher complained that the Superintendents and Assistant Superintendents did not hold Building Principals/administrators accountable for upholding the law. Therefore, the structure of having special education supervisors reporting to Building Principals/administrators made it virtually impossible to hold supervisors to their primary role of upholding the law. Langlais refused to make changes.

55.     On May 27, 2021, the Lewiston Schools entered into a Settlement Agreement with the United States Department of Justice ("Settlement Agreement") regarding an investigation conducted by the United States Department of Justice about the Lewiston Schools

repeated violation of students' civil rights by over relying on suspension, expulsion and abbreviated school day to address behaviors caused by students' disabilities. The Settlement Agreement addressed the very practices Boucher continued to complain about and that the Lewiston Schools refused to correct. Boucher's complaints occurred throughout the Department of Justice investigation and her complaints were still ignored and retaliation against her for making those complaints continued. The consultant review, which was controlled by the Superintendents and used to retaliate against Boucher, did not review or address the issues under investigation by the Department of Justice.

56. In June 2021, Boucher complained to Langlais and the Assistant Superintendent and Human Resources that special education ed techs continued to be required by Building Principals/administrators to substitute teach in general education classrooms, interfering with providing special education services.

57. On August 19, 2021, Langlais and Boucher met at the request of Langlais. At the meeting, Langlais, acting with the authority of the School Committee, and consistent with the Lewiston School's ongoing disregard for the law, informed Boucher that the Lewiston Schools was terminating her employment by the end of the day unless she resigned. Boucher objected that she had a contract. Langlais falsely stated that the contract was "not worth the paper it was written on" and gave Boucher to the end of the following day to make a decision.

58. On August 19, 2021 Langlais sent Boucher a letter indicating the following:

> Following up on our conversation this afternoon, I have come to the conclusion that it is time to part ways based on unsatisfactory performance and not fulfilling the duties of your position.
>
> Acting with the authority of the Lewiston Public Schools' School Committee and following the terms of the management contract issued to you on June 30, 2020, your employment will be terminated effective August 21, 2021 due to issues cited above. As

> I mentioned in our conversation, I am willing to accept your resignation in lieu of termination. Please let me know if this is the way you would like to proceed with a resignation or if there is anything further you wish to share by the end of day August 20, 2021.

59. Boucher responded to Langlais' letter asserting that the Lewiston School Department would be in breach of her contract if it were to unilaterally terminate her employment. Boucher further stated that she would not resign because she had done excellent work for the district, despite having been targeted for speaking in support of special education. The Lewiston Schools again ignored Boucher's complaint and terminated her employment on August 21, 2021.

60. On August 24, 2021, Boucher, through counsel, requested a copy of her personnel file pursuant to 26 M.R.S.A. § 631. Lewiston Schools produced Boucher's personnel file, however, in violation of the statute, required information was missing from her file.

61. Upon information and belief, during this period of time, Lewiston Schools consulted with counsel.

62. On September 9, 2021, Langlais wrote another letter to Boucher, attempting to reinstate Boucher's employment for the sole purpose of providing a hearing before the School Committee to whom he would present the case that Boucher should be terminated.

63. Langlais' September 9, 2021 letter is an admission that the Lewiston Schools violated Boucher's rights.

64. Because Langlais had expressly acted with the authority of the School Committee on August 19, 2021 the Lewiston Schools had already violated Boucher's rights and any hearing would have been a sham.

65. The Lewiston School Committee had at least three meetings after Langlais acted with the authority of the School Committee and terminated her employment during which it did not take action with respect to Langlais' actions.

66. Boucher has demanded that her wages remaining on her contract be paid in full on the termination of her employment.

## Count I

## Breach of Contract

67. Plaintiff re-states and re-alleges each and every allegation set forth in paragraphs 1-66 of this Complaint as if fully set forth herein.

68. Plaintiff had a contract with Defendants, the terms of which are set out in Exhibits 1 and 2 to this Complaint.

69. Plaintiff's contract could not be terminated except for cause.

70. No cause existed to terminate Plaintiff's contract.

71. Defendants materially breached Plaintiff's contract by terminating her employment on August 19, 2021.

72. Plaintiff has suffered damages.

## Count II

## Violation of 26 M.R.S.A. § 626

73. Plaintiff re-states and re-alleges each and every allegation set forth in paragraphs 1-72 of this Complaint as if fully set forth herein.

74. Plaintiff had a contract with Defendants that required her wages be paid through June, 2023.

75. Plaintiff demanded payment for all of her wages due pursuant to her contact be paid upon termination of her employment.

76. Defendants have failed to pay her wages.

77. Plaintiff is entitled to recover her wages, liquidated damages of twice the amount of wages, plus interest cost and attorneys' fees.

## Count III

### Violation of Implied Covenant of Good Faith and Fair Dealing

78. Plaintiff re-states and re-alleges each and every allegation set forth in paragraphs 1-77 of this Complaint as if fully set forth herein.

79. Plaintiff had a written contract with the Defendants for a specified duration and that could only be terminated for cause.

80. A covenant of good faith and fair dealing is implied to Plaintiff's contract.

81. Defendants, by their actions, violated the implied covenant of good faith and fair dealing and breached Plaintiff's contract.

82. Plaintiff has suffered damages as a result of Defendants' actions.

## Count IV

### Violation of 42 U.S.C. § 1983

### Boucher v. Langlais

83. Plaintiff re-states and re-alleges each and every allegation set forth in paragraphs 1-82 of this Complaint as if fully set forth herein.

84. Plaintiff was employed the Lewiston Schools, a municipality organized under the laws of the State of Maine.

85. Defendant Langlais was the Superintendent of Lewiston Public Schools, who, at all times relevant to this Complaint acted under color of state law.

86. Defendant Langlais intentionally and materially breached Plaintiff's contract by terminating, prior to the term provided by the contract, by acting without cause and by failing to provide notice and opportunity to be heard.

87. Defendant Langlais, violated Plaintiff's right to due process of law and violated 42 U.S.C. § 1983.

## Count V

## Violation of 42 U.S.C. §1983

## Boucher v. Lewiston School Committee

88. Plaintiff re-states and re-alleges each and every allegation set forth in paragraphs 1-87 of this Complaint as if fully set forth herein.

89. Defendant Langlais expressly stated that he had the authority of the Lewiston Schools to terminate Boucher's employment.

90. Defendant Lewiston Schools held several meetings after Boucher's termination and did not act contrary to the authority it delegated.

91. Defendant Langlais, on behalf of Lewiston Schools, had the policy making authority over termination practices.

92. Plaintiff had a constitutionally protect property interest in her employment by virtue of her contract.

93. Defendant's violated Plaintiff's constitutional right to due process by failing to provide a pre-termination notice and opportunity to be heard.

94. Defendant's violation of Plaintiff's constitutional right to due process is a result of enforcement of a municipal policy, practice and decision of a final policy maker.

95. Plaintiff has been damaged by Plaintiff's violation of her constitutional rights.

WHEREFORE, Plaintiff requests that this Court grant the following relief:

(a) enter judgment in her favor;

(b) award plaintiff damages for loss of wages;

(c) declare the conduct engaged in by Defendant to be in violation of Plaintiff's rights;

(d) award compensatory and punitive damages in an amount to be determined at trial and prejudgment interest thereon;

(e) award Plaintiff nominal damages;

(f) award Plaintiff prejudgment interest;

(g) award Plaintiff her full costs, including reasonable attorney's fees, expert fees and costs; and

(h) award such further relief as is deemed appropriate.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE

Dated this 20th day of September 2021

/s/Sally Morris
Sally A. Morris, Bar No. 8479
Jennifer H. Rohde Bar No. 8694
Sally A. Morris Attorney at Law, LLC
Six City Center, Suite 300
Portland, ME 04101
(207) 558-6161
Smorris@morrisemploymentlaw.com
jenrohde6@outlook.com
Attorneys for Plaintiff Pam Boucher