## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| PAMELA BOUCHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Docket No. 2:21-cv-00273-NT |
| | ) |
| LEWISTON SCHOOL COMMITTEE, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

Before me is the Defendants' motion to dismiss for failure to state a claim (ECF No. 8). For the reasons stated below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND[1]

The Plaintiff, Pamela Boucher, is a Maine resident who was formerly employed by one of the Defendants, the School Committee of the City of Lewiston, Maine (the "**School Committee**"). Compl. ¶¶ 1, 6 (ECF No. 1). The School Committee is the organization charged with oversight and management of the Lewiston schools. Compl. ¶ 5. Boucher began working for the School Committee as a Home School Social Worker in 2012; in 2014, she became the District Clinical Supervisor. Compl. ¶ 6. In

---

[1] The following facts are drawn from the allegations contained in the Plaintiff's Complaint, which I must accept as true for the purpose of evaluating the motion to dismiss, see *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021), and from the documents incorporated therein.

July of 2016, Boucher was appointed as the Director of Special Education, the position she held until her employment ended in 2021. Compl. ¶¶ 6, 59.

In November of 2019, Boucher and the School Committee entered into a contract for the term beginning July 1, 2019 and ending June 30, 2022. Compl. Ex. 1 (ECF No. 1-1). In June of 2020, Boucher and the School Committee entered into another contract for the term beginning July 1, 2020 and ending June 30, 2023. Compl. Ex. 2 (ECF No. 1-2). Aside from a salary increase, the terms of the 2019 contract and 2020 contract are materially identical. Compl. Exs. 1, 2. Both contracts contain a provision stating that the contract "may be terminated by mutual consent at any time and may be terminated by the School Committee for cause as provided by statute." Compl. Exs. 1, 2.

According to Boucher, her tenure as Director of Special Education was a tumultuous one due to what she perceived as the School Committee's disregard of its duty to provide special education services to its students. On several occasions that she describes in her Complaint, Boucher clashed with administrators over issues such as the wrongful exclusion of a student from Lewiston High School, the provision of services to students with autism, the lack of transparency in the budgeting process, and an organizational structure that gave principals/administrators authority over special education supervisors. Compl. ¶¶ 17, 28, 29, 31, 38.

Over the course of her employment, Boucher received some critical feedback about her performance. In July of 2017, Boucher received her first and only formal performance review, which was "highly complimentary of [her] skills and rated her

performance effective." Compl. ¶ 22. The following month, however, an addendum was issued to Boucher's performance evaluation based on "anecdotal information" from exit interviews with general and special education staff that identified negative criticisms of Boucher's performance. Compl. ¶¶ 23–24. The Superintendent at the time, William Webster, promised Boucher that the performance addendum would not negatively impact her position, but asked that Boucher work with a job coach. Compl. ¶ 24. After Boucher worked with the job coach selected by Webster for over five months, the coach issued a report that was "highly complimentary of Boucher's skills and leadership." Compl. ¶ 25.

In 2018, rather than conduct a formal performance review, the Assistant Superintendent prepared a memorandum titled "Concerns" (the "**concerns memorandum**") that, according to Boucher, "criticized Boucher for interactions arising out of her efforts to ensure compliance with special education law and pointed to untrue criticism by staff." Compl. ¶ 32. Boucher viewed the concerns memorandum as "retaliation" for her clashes with staff and administrators over special education services and the budgeting process. Compl. ¶ 33. Still, in response to the concerns memorandum, Boucher reached out to her job coach and initiated additional work with him. Compl. ¶ 34.

In 2020, the then-Superintendent, Todd Finn, engaged private consultants to conduct a review of the special education department—a move that Boucher perceived as "retaliation" for her complaints regarding the Lewiston schools' practices. Compl. ¶¶ 37, 41. Boucher felt that the resulting report unfairly maligned

the special education department for issues that were out of her control. Compl. ¶¶ 44–45.

Defendant K. Jake Langlais became Superintendent of the Lewiston schools in the summer of 2020. Compl. ¶ 49. On August 19, 2021, Langlais requested a meeting with Boucher. Compl. ¶ 57. At that meeting, Langlais informed Boucher that the School Committee was terminating her employment by the end of the day unless she resigned. Compl. ¶ 57. When Boucher objected that she had a contract, Langlais responded that "the contract was 'not worth the paper it was written on.' " Compl. ¶ 57. Langlais gave Boucher until the end of the following day to make her decision. Compl. ¶ 57. The same day that they met, Langlais sent Boucher a letter stating:

> Following up on our conversation this afternoon, I have come to the conclusion that it is time to part ways based on unsatisfactory performance and not fulfilling the duties of your position.
>
> Acting with the authority of the Lewiston Public Schools' School Committee and following the terms of the management contract issued to you on June 30, 2020, your employment will be terminated effective August 21, 2021 due to issues cited above. As I mentioned in our conversation, I am willing to accept your resignation in lieu of termination. Please let me know if this is the way you would like to proceed with a resignation or if there is anything further you wish to share by the end of day August 20, 2021.

Compl. ¶ 58. Boucher refused to resign, and her employment was terminated on August 21, 2021. Compl. ¶ 59.

On August 24, 2021, Boucher, through counsel, requested a copy of her personnel file from the School Committee. Compl. ¶ 60. A little over two weeks later, on September 9, 2021, Langlais wrote a letter (the "**Reinstatement Letter**") to Boucher announcing that Boucher would be given a School Committee hearing

"before a final decision is made regarding termination of employment." Mot. to Dismiss ("**MTD**") Ex. A (ECF No. 8-1).[2] Langlais wrote that the hearing was scheduled for September 20, 2021, and that he would "share information with the School Committee in support of [his] recommendation to end [her] employment." MTD Ex. A. He also told Boucher that she would have "the opportunity to attend the hearing, and to present witnesses, written documents and other evidence for the School Committee's consideration." MTD Ex. A. The Reinstatement Letter explained that, "[c]onsistent with the decision to provide [Boucher] an opportunity for a School Committee hearing," Boucher's employment was reinstated, with compensation and benefits retroactive to August 21, 2021. MTD Ex. A. Boucher does not allege that she attended the hearing and states in her Complaint that "any hearing would have been a sham." Compl. ¶ 64.

On September 20, 2021, the same day that the hearing was to take place, Boucher filed a complaint in this court against Langlais and the School Committee (together, the "**Defendants**") alleging breach of contract (Count I), failure to pay wages in violation of 26 M.R.S. § 626 (Count II), violation of the implied covenant of

---

[2]         "Ordinarily, [on a motion to dismiss,] any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under [Federal Rule of Civil Procedure] 56." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). "However, courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.*; *see also In re Fin. Oversight & Mgmt. Bd. for P.R.*, 979 F.3d 10, 17 (1st Cir. 2020). In this case, although it was not attached to Boucher's Complaint, I may consider the full text of the September 9 letter because it is incorporated by reference into paragraphs 62 and 63 of the Complaint.

good faith and fair dealing (Count III), and § 1983 claims alleging violations of Boucher's procedural due process rights (Counts IV and V).

## LEGAL STANDARD

The Defendants' motion to dismiss invokes Federal Rule of Civil Procedure 12(b)(6). When evaluating a motion to dismiss, I take "as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)). "[A] complaint will survive a motion to dismiss when it alleges 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible" if the facts alleged give rise to a reasonable inference of liability. *Id.* "Plausible" means "more than merely possible." *Germanowski v. Harris*, 854 F.3d 68, 71 (1st Cir. 2017) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)).

## DISCUSSION

### I.   Federal Procedural Due Process Claims

Section 1983 of the Civil Rights Act confers upon every United States citizen a right of redress against any person who, acting under color of state law, causes a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "[T]o make out a viable section 1983 claim, a plaintiff must show both that the conduct complained of transpired under color of state law and that a deprivation of federally secured rights ensued." *Godin v.*

*Machiasport Sch. Dep't Bd. of Dirs.*, 831 F. Supp. 2d 380, 385 (D. Me. 2011) (quoting *Santiago*, 655 F.3d at 68). In this case, Boucher's § 1983 claim asserts that she had a constitutionally protected property interest in her employment, and that the Defendants violated her right to due process of law by acting without cause and by failing to provide notice and an opportunity to be heard. Compl. 18–19.

The First Circuit "consistently has held that an employee who under state law can be terminated only for 'just cause' has a constitutionally protected property interest in his employment." *Whalen v. Mass. Trial Ct.*, 397 F.3d 19, 24 (1st Cir. 2005). Here, Boucher's contracts provide that she "may be terminated . . . for cause as provided by statute." Compl. Exs. 1, 2. At this stage, the Defendants assume without conceding that Boucher had a property interest in her continued employment with the School Committee. MTD 6. The Defendants argue instead that Boucher's procedural due process claim should fail because (1) she was still employed by the School Committee at the time she filed her Complaint, and thus there was no deprivation of her rights, and (2) the facts established in the Complaint and incorporated documents establish that she was provided sufficient process. MTD 6–10.

I reject the Defendants' first line of attack — that Boucher was still employed by the School Committee at the time she filed her Complaint — because Boucher plausibly asserts that her employment was terminated on August 21, 2021. Although Langlais sent Boucher a letter on September 9, 2021, purporting to reinstate Boucher's employment with back pay, Boucher's complaint asserts that Langlais had

already terminated Boucher's employment on August 21, and that the Reinstatement Letter was merely an "attempt[ ] to reinstate Boucher's employment." Compl. ¶¶ 59, 62, 64. While the Defendants contend that I cannot consider Boucher's claim that she refused the reinstatement because it is not alleged in the Complaint but only offered in her opposition to the Motion to Dismiss, it is reasonable to infer from the facts that are alleged in the Complaint that Boucher did not agree to the reinstatement.

I thus consider the Defendant's second line of attack, that is, whether Boucher was afforded sufficient process. Where a public employee has a property interest in continued employment, the employer must provide some process prior to depriving the employee of her property interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). That pre-termination process "need not be elaborate." *Id*. at 545. "The essential requirements of due process . . . are notice and an opportunity to respond." *Id*. at 546. "The standard the defendant must meet . . . is not high." *Chmielinski v. Massachusetts*, 513 F.3d 309, 316 (1st Cir. 2008). The employer need only provide the employee "oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." *Loudermill*, 470 U.S. at 546.

In this case, Boucher claims that Langlais announced the School Committee's decision to terminate Boucher's employment in the meeting on August 19. Compl. ¶ 57. Langlais offered Boucher the opportunity to resign and gave her until the end of the following day, August 20, to make her decision. Compl. ¶ 57. Langlais sent Boucher a letter shortly after the meeting that restated the Defendants' intent to

terminate Boucher, explained that the decision to terminate Boucher was "based on unsatisfactory performance and not fulfilling the duties of your position," and asked Boucher to let Langlais know if she "would like to proceed with a resignation or if there is anything further you wish to share by the end of day August 20, 2021." Compl. ¶ 58.

The Defendants assert that Langlais' actions on August 19 constitute sufficient process: Boucher was "offered notice of the [termination] decision, the basis for it, and the opportunity to comment before it was final, which is all that is required under the Due Process Clause." MTD 6–7. The Defendants cite to *O'Neill v. Baker*, 210 F.3d 41 (1st Cir. 2000) to emphasize just how little notice and opportunity to respond is constitutionally required. MTD 7. In that case, the First Circuit held that a pre-termination hearing satisfied due process even though the plaintiff was not specifically told that the hearing was a termination meeting, and the employer sent the termination letter prior to the hearing. *O'Neill*, 210 F.3d at 48–49. But *O'Neill,* which was decided at the summary judgment stage, is distinguishable from the instant case in several important respects.

First, the plaintiff in *O'Neill* had faced disciplinary actions on three occasions prior to her final termination due to her chronic absenteeism, and on each of those occasions she had been provided notice that failure to improve her attendance could lead to termination. *Id.* at 48. Second, O'Neill received notice that her employer was holding a hearing and was "told the meeting was about her attendance and '[c]ontemplated [a]ction.' " *Id.* She was also told that she had a right to have a union

9

representative present "[d]ue to the nature of the meeting," and the hearing was continued to allow her to make arrangements for the union representative to join. *Id.* at 45. Although O'Neill was not specifically told prior to the hearing that the meeting was for the purpose of terminating her employment, the writing was on the wall, given that she had previously been warned that termination was a possible consequence of failing to improve her attendance. *Id.* at 48. Third, at the meeting itself, it was explained that the reason for the termination was the plaintiff's absenteeism, and "the charges were clearly laid out" in detail. *Id.* Fourth, O'Neill was provided "an opportunity to give her side of the story" at the pre-termination hearing, and "[s]he had also been given the opportunity to respond" when each of the prior disciplinary actions took place. *Id.* Fifth, although the employer inadvertently sent the termination letter prior to the pre-termination hearing, it was uncontested that the employer "would have 'reconsidered whether there was just cause to discharge [O'Neill]' if O'Neill had offered 'compelling reasons indicating that the contemplated discharge was unwarranted.' " *Id.* at 49.

Here, by contrast, Boucher claims that she was given negative feedback about her performance on only two prior occasions, and she was not told on either of those occasions that she could be terminated if she failed to improve. In fact, the first time she received negative criticism, she was specifically told that the feedback would *not* affect her position, and after working with a job coach on the performance issues, she received positive feedback. Compl. ¶¶ 24, 25. Second, the facts alleged in Boucher's complaint allow an inference that Langlais called the termination meeting without

advance warning and with no indication of what the meeting was about. Compl. ¶ 57. Third, according to Boucher, the explanation for her termination was only provided in the follow-up letter sent by Langlais after the meeting, and even that explanation provided no detail as to the specific reasons for Boucher's termination. Compl. ¶¶ 57–58. Fourth, although the follow-up letter asked Boucher to let Langlais know "if there is anything further you wish to share," Boucher was given less than a day to prepare a response. Finally, the letter did not specify that additional information provided by Boucher could change the outcome of the termination decision. *See* Compl. ¶ 58. Indeed, given that Boucher's choice at that point was to resign or be terminated, it is reasonable to infer that Boucher was not being given a meaningful opportunity to respond.

The Defendants argue that, even if the pre-termination process was not sufficient by itself, "*Loudermill* teaches that the need for pre-termination process is lessened where more extensive post-termination process exists." MTD 7. Here, the Reinstatement Letter indicates that Boucher was offered extensive post-termination process: she was offered a hearing with the School Committee where she could present witnesses and written documents as evidence; she was given eleven days to prepare for the hearing; and she was offered retroactive pay and benefits prior to the hearing. MTD Ex. A.

I am not convinced, however, that *Loudermill* stands for the proposition that extensive post-termination process necessarily cures the constitutional deficiencies of a pre-termination process. Rather, *Loudermill* held that the pre-termination process

11

must, at the very least, provide the employee "oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." 470 U.S. at 546. Whether *additional* requirements are necessary to satisfy due process may depend on "the nature of the subsequent proceedings," but those basic requirements of pre-termination process must always be met. *See id.* at 545 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971)); *see also Jones v. City of Boston*, 752 F.3d 38, 57 (1st Cir. 2014) ("When a state employee in the ordinary course terminates another employee who has a property interest in his or her job, the state normally cannot satisfy due process solely through post-termination process."); *Cotnoir v. Univ. of Me. Sys.*, 35 F.3d 6, 12–13 (1st Cir. 1994) ("[E]ven where a discharged employee receives a post-termination hearing to review adverse personnel action, the pretermination hearing still needs to be extensive enough to guard against mistaken decisions, and accordingly, the employee is entitled to notice, an explanation of the employer's evidence, and an opportunity to present his side of the story.").

Here, Boucher has plausibly alleged that the pre-termination process did not satisfy the basic requirements of due process. On the facts alleged, she was given no notice that her job might be in danger, was not given an explanation of Langlais' evidence, was not explicitly provided a meaningful pre-termination opportunity to present her side of the story, and was told that her contract was not worth the paper that it was written on. It is not completely clear to me, at this early point in the proceedings, how Boucher's decision not to proceed with the post-termination process

will ultimately affect this litigation. The parties talk past each other on this point with the Defendants insisting that Boucher was not terminated because of the later offer to reinstate and with the Plaintiff asserting that any post-termination proceeding would have been a sham. What is clear is that on these facts, at the motion to dismiss stage, I cannot say that the extensive post-termination process offered to Boucher cured the constitutional deficiencies of the pre-termination process.

### A.  Count V – The School Committee's Liability

As the Defendants concede, municipal entities, such as school committees, are "persons" who can be held liable for civil rights violations pursuant to § 1983. *See* MTD 10 (citing *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690 (1978)). However, "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. "[A] municipality cannot be made liable by application of the doctrine of *respondeat superior*." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). Municipal liability "is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* at 480. A municipality may be held liable for even a single instance of misconduct perpetrated by a government officer if that officer has final policymaking authority.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[A]n unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."); *Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008) ("Although liability may not be imposed on a municipality for a single instance of misconduct by an official

lacking final policymaking authority, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." (internal citation and quotation marks omitted)).

"Whether a person is an authorized policymaker for purposes of assigning municipal liability is a question of state law." *Craig v. Me. Sch. Admin. Dist. #5,* 350 F. Supp. 2d 294, 296 (D. Me. 2004). Here, Boucher concedes that Maine law does not assign final policymaking authority to the Superintendent. Yet, even where state law does not explicitly assign policymaking authority to the decisionmaker, municipal liability may be established if that authority has been delegated to the decisionmaker. *See Putnam v. Reg'l Sch. Unit 50*, No. 1:14-cv-00154-JAW, 2015 WL 5440783, at *19 (D. Me. Sept. 15, 2015). And, regardless of whether the decisionmaker possesses final policymaking authority, a municipality can be held liable if it ratifies the decisionmaker's actions. *Craig*, 350 F. Supp. 2d at 297. Boucher argues that the School Committee can still be held liable for Langlais' actions on either a delegation or ratification theory. Pl.'s Opp'n to Defs.' MTD 15–18 (ECF No. 13).

With regard to employment decisions, "[t]he mere fact" that a superintendent "had discretionary and final authority to make the decision in question does not necessarily mean that he was a 'policymaker' with respect to that decision." *Craig*, 350 F. Supp. 2d at 297 (quoting *Krennerich v. Inhabitants of Bristol*, 943 F. Supp. 1345, 1356 (D. Me. 1996)). "To demonstrate that a superintendent possesses final policymaking authority, a plaintiff must establish that the [municipal entity] in fact specifically delegated its authority in this area." *Putnam*, 2015 WL 5440783, at *19.

14

Thus, to survive a motion to dismiss, the Plaintiff must plausibly allege that the municipal entity "specifically delegated its policymaking functions to" the Superintendent. *See Craig*, 350 F. Supp. at 297 & n.2 (granting a motion to dismiss where the plaintiff did not allege that the school board "specifically delegated its policymaking functions to" the superintendent); *Charette v. Me. Sch. Admin. Dist. No. 27*, No. Civ.05-20-B-W, 2005 WL 914763, at *4 (D. Me. Jan. 31, 2005) (denying a motion to dismiss because, unlike in *Craig*, the plaintiff "allege[d] that it is the [municipal entity's] custom and usage to place final policymaking authority in [the s]uperintendent . . . —its top administrator—and that it in fact delegated that authority to [the superintendent] insofar as . . . at-will employees [were] concerned"), *report and recommendation adopted by* 2005 WL 1126853 (D. Me. May 11, 2005).

In this case, Boucher alleges in her complaint that "Defendant Langlais, on behalf of [the School Committee], had the policy making authority over termination." Compl. ¶ 91. And Boucher has alleged facts showing that Langlais *acted* as though he had final policymaking authority in regard to termination procedures. Whether Boucher can ultimately prove her allegation that Langlais was delegated policy making authority over the termination process remains to be seen, but at the motion to dismiss stage, I must interpret the facts in Boucher's favor. Because the Complaint plausibly alleges facts that could justify the imposition of municipal liability under a

delegation theory,[3] I deny the Defendants' motion to dismiss Count V of Boucher's Complaint.

### B.   Count IV – Langlais' Liability

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, "when sued in their individual capacities, government officials are immune from damages claims unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.' " *Eves v. LePage*, 927 F.3d 575, 582–83 (1st Cir. 2019) (en banc) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). "Qualified immunity . . . is intended to protect all but the plainly incompetent or those who knowingly violate the law. Accordingly, although there need not be a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 583 (internal quotation marks and citations omitted).

As explained above, Boucher plausibly alleges that the pre-termination procedures used by the Defendants were insufficient to satisfy the requirements of procedural due process. Boucher was not provided notice of possible termination or the charges against her, and she was not given a meaningful pre-termination

---

[3]     Because Boucher's Complaint plausibly alleges that the School Committee delegated final policymaking authority to Langlais for the purpose of firing employees, I do not consider her ratification theory.

opportunity to respond. In fact, when she raised the issue of her employment contract, Langlais told her that it was not worth the paper it was written on.[4] A reasonable official should have known that where an employer was required to have cause to terminate an employee, the failure to provide the employee with notice, an explanation of the evidence, or a meaningful opportunity to respond would violate procedural due process requirements. *See Cotnoir*, 35 F.3d at 11–12 (denying qualified immunity to a school superintendent who failed to provide pre-termination notice, an explanation of evidence, and an opportunity to respond to an employee). Moreover, a reasonable official would not believe that even extensive post-termination process could "cure the violation." *See id.* at 12–13. The Defendants' motion to dismiss Count IV is denied.

## II.   State Law Claims

### A.   Counts I and III Against Langlais

In Counts I and III, Boucher brings two state law claims that are styled as claims against the "Defendants." Compl. ¶¶ 71, 81.[5] Count I alleges a breach of her employment contract, and Count III asserts a claim grounded in her employment contract for a violation of an implied covenant of good faith and fair dealing. The

---

[4]     Of course, this allegation cuts both ways: while it strengthens the case against affording Langlais qualified immunity, it potentially undercuts Boucher's argument regarding municipal liability. At this stage, however, I find that there are enough facts alleged in Boucher's Complaint to allow the claims against both Defendants to survive the motion to dismiss.

[5]     Boucher's Complaint also asserts that the "Defendants" violated 26 M.R.S. § 626, Compl. ¶ 76 (ECF No. 1), but Boucher clarifies in her Opposition to the Defendants' Motion to Dismiss that she does not seek to hold Langlais individually liable for that violation. *See* Pl.'s Opp'n to Defs.' MTD 22 n.6 (ECF No. 13).

Defendants assert that these claims against Langlais should be dismissed because Langlais was not a party to the employment contract. I agree.

The contracts at issue here were between Boucher and the School Committee, not between Boucher and Langlais. *See* Compl. Exs. 1, 2. "It goes without saying that a contract cannot bind a nonparty." *Guerrette v. Dyer*, No. CV-13-180, 2014 WL 7920630, at *3 (Me. Super. Ct. July 9, 2014) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)). And, "[w]hen an agent is not a party to a contract between the principal and a third party, the agent is not liable to the third party for a breach of that contract." *Cnty. Forest Prods., Inc. v. Green Mountain Agency, Inc.*, 2000 ME 161, ¶ 42, 758 A.2d 59. Thus, even if Langlais were an agent of the School Committee, he is not personally liable for a breach of the contract with Boucher. Similarly, even if a duty of good faith and fair dealing exists between the contracting parties, this duty would not extend to Langlais personally. *Cf. AccuSoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001) (describing the implied covenant of good faith and fair dealing as a covenant "between parties to a contract"). Counts I and III are dismissed as to Langlais.

### B.    Count I – Breach of Contract – Against the School Committee

Boucher alleges that the School Committee breached its contract when it terminated Boucher's employment without cause. Compl. ¶¶ 69–71. The Defendants argue that Boucher's breach of contract claim against the School Committee fails for two reasons. First, even if Boucher's termination on August 21, 2021, was a breach, the School Committee "cured" the breach by the time Boucher brought her lawsuit by reinstating Boucher's pay and benefits. MTD 16. Second, the breach of contract claim

18

fails because Boucher has failed to allege damages resulting from any breach. MTD 16.

As to the Defendants' first argument, I am not convinced that the Reinstatement Letter "cured" the breach. The Defendants cite the Restatement (Second) of Contracts § 241 and *Tobin v. Barter*, 2014 ME 51, 89 A.3d 1088, in support of their argument regarding cure, but they do not cogently argue how either of these authorities supports their position. The Restatement (Second) of Contracts § 241 does state that "the likelihood that the party failing to perform . . . will cure his failure" is a "significant" circumstance "[i]n determining whether a [breach] is material." Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981). But the cited portion of the Restatement does not provide insight into whether the Reinstatement Letter actually *did* cure the breach. The reference to *Tobin* is even more perplexing since *Tobin* did not involve the issue of whether curing a breach can render a breach immaterial.

The Defendants' second argument—that Boucher has failed to allege damages—does not fare much better. A breach of contract action entails three elements: (1) breach of a material contract term; (2) causation; and (3) damages. *Wetmore v. MacDonald, Page, Schatz, Fletcher & Co.*, 476 F.3d 1, 3 (1st Cir. 2007). At the motion to dismiss stage, "a complaint need not plead facts sufficient to establish a *prima facie* case." *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 718 (1st Cir. 2014) (internal quotation marks omitted). "That said, the elements of a *prima facie* case remain relevant to [the] plausibility assessment, as

those elements are part of the background against which a plausibility determination should be made." *Id.* (internal quotation marks omitted). Here, Boucher plausibly asserts that her employment was terminated on August 21, 2021. Although the Reinstatement Letter incorporated by reference into Boucher's Complaint shows that the School Committee *attempted* to reinstate Boucher with retroactive compensation and benefits, it is reasonable to infer that Boucher did not accept this reinstatement and thus that she did not receive the compensation and benefits she claims are owed to her. The Defendants seem to assume that Boucher was required to accept the reinstatement, but they do not address her argument that "a material breach of contract . . . justifies the injured party in regarding the whole transaction as at an end." Pl.'s Opp'n to Defs.' MTD 20 (citing *H&B Realty, LLC v. JJ Cars, LLC*, 2021 ME 14, ¶ 16, 246 A.3d 1176, 1184). Making all reasonable inferences in Boucher's favor, I cannot say at this stage that Boucher has failed to allege damages in this breach of contract action. The motion to dismiss Count I is denied.

## C.   Count II – 26 M.R.S. § 626

Under 26 M.R.S. § 626, "[a]n employee leaving employment must be paid in full no later than the employee's next established payday." The Defendants argue that Boucher's § 626 claim fails for two reasons: (1) because Boucher was still employed by the School Committee at the time she filed her Complaint, and therefore was not "[a]n employee leaving employment" within the meaning of the statute; and (2) because, even if she was terminated, her claim is a wrongful discharge claim for which § 626 has no application. MTD 16–17 (internal quotation marks omitted). Both arguments are problematic.

First, as explained above, Boucher has plausibly alleged that her employment was terminated on August 21, 2021. While Boucher's Complaint acknowledges the Defendants' *attempt* to reinstate her employment, it is reasonable to infer, as I must at the motion to dismiss stage, that this was not a successful attempt. Thus, dismissal of Count II is not appropriate on this basis.

As for their second argument, the Defendants cite only one case in support of their contention that Boucher cannot recover under § 626, but that case is not on point. In *Learnard v. Inhabitants of the Town of Van Buren*, the plaintiff asserted a prayer for § 626 damages in his count asserting a violation of § 1983. 164 F. Supp. 2d 35, 44 (D. Me. 2001) (holding that "it is inappropriate for Plaintiff to invoke [§ 626] as a component of the damages requested under [a § 1983 claim]"). Unlike the plaintiff in *Learnard*, Boucher is not attempting to recover damages under § 626 for a violation of § 1983. Rather, Boucher's Complaint sets the § 626 claim out as a separate cause of action for unpaid wages, *see* Compl. ¶¶ 74–77, precisely the kind of action that the *Learnard* court acknowledged *was* eligible for recovery under § 626, *see* 164 F. Supp. 2d at 44 ("[Section 626] authorizes employees to sue their employers for failing to pay wages."). While caselaw may exist that supports the Defendants' argument that § 626 is not available in a wrongful termination case, the Defendants have not cited it, and it is not apparent to me why it should be the case that § 626 and wrongful termination claims should be mutually exclusive. *Cf. United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the

ossature for the argument, and put flesh on its bones."). The motion to dismiss Count II is therefore denied.

### D.    Count III – Implied Covenant of Good Faith & Fair Dealing

The Defendants argue that Count III of the Plaintiff's Complaint should be dismissed because "Maine law does not recognize a duty of good faith and fair dealing outside of insurance contracts and contracts governed by the Uniform Commercial Code." MTD 16 (citing *Montany v. Univ. of New Eng.*, 858 F.3d 34, 42–43 (1st Cir. 2017)). Boucher responds that Maine courts have not specifically refused to recognize an implied duty of good faith and fair dealing in the context of a for-cause employment relationship, and she cites two cases that she says "suggest[ ] that the Law Court would, in fact, recognize such a duty." Pl.'s Opp'n to Defs.' MTD 21–22 (citing *Godin*, 831 F. Supp. 2d at 386 & n.7 (describing the holding of *Paradis v. Sch. Admin Dist. No. 33 Sch. Bd.*, 446 A.2d 46 (Me. 1982))). However, both *Godin* and *Paradis* are distinguishable from the instant case.

*Godin* and *Paradis* involved the elimination of positions based on rationales allowed under state law. In each case, there was a statutory obligation imposed on school districts to act in good faith when eliminating positions under these rationales, and each plaintiff claimed that the school administrators had invoked the given rationale in bad faith as a subterfuge to circumvent contractual for-cause termination procedural requirements. *See Godin*, 831 F. Supp. 2d at 386–87; *Paradis*, 446 A.2d at 50. While these cases recognized a statutorily-imposed obligation to act in good faith under specific circumstances, neither case recognized the existence of a general

implied covenant of good faith and fair dealing present in all for-cause employment contracts.

"The practice of federal courts predicting the content of state substantive law where it is shrouded in doubt is always a risky . . . venture." *Renaissance Yacht Co. v. Stenbeck*, 818 F. Supp. 407, 412 (D. Me. 1993). To date, Maine courts have only recognized an implied covenant of good faith and fair dealing in specific types of contracts, none of which are at issue here. *See Montany*, 858 F.3d at 24–43. Absent a clear holding by Maine state courts to the contrary, I decline to expand the implied duty of good faith and fair dealing to all for-cause employment contracts. The motion to dismiss Count III as to the School Committee is granted.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' motion to dismiss (ECF No. 8). The Defendants' motion to dismiss is **GRANTED** as to Count I, as it pertains to Langlais, and as to Count III in its entirety. The motion is **DENIED** in all other respects.


SO ORDERED.

                                        /s/ Nancy Torresen
                                        United States District Judge

Dated this 11th day of March, 2022.